RECEIPT # _57372_
AMOUNT $ _140-_
SUMMONS ISSUED _3_
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _7-16-04_

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

C.A. No.

ENVIRONMENTAL PACKAGING
TECHNOLOGIES, INC. and
THOMAS P. HAMBLETON,

      Plaintiffs,

    v.

WILLIAM D. EWING, ENVIRO-MEDIA,
INC. and JOSEPH TOMILSON,

      Defendants.

**COMPLAINT and
DEMAND FOR
JURY TRIAL**

# 04 - 11587 WGY

MAGISTRATE JUDGE _Alexander_

## INTRODUCTION

This action for declaratory relief, breach of contract, breach of covenant of good

faith and fair dealing, breach of fiduciary duty, conspiracy, tortious interference,

accounting and violations of Section 11 of Massachusetts General Laws Chapter 93A

arises out of the continuing breach by defendants of their contractual and fiduciary duties

owed to plaintiffs. Plaintiff Thomas Hambleton, a product development consultant, and

defendant William D. Ewing, an inventor and patent holder, began working together five

years ago to exploit certain patents Ewing and his company, defendant Enviro-Media,

Inc., held or licensed. The product under development has the potential to revolutionize

its industry. The parties memorialized their business partnership in 2002, pursuant to

which they jointly formed plaintiff Environmental Packaging Technologies, Inc. to

exclusively manage and control the base supply material necessary for the manufacture of

the Product. Ewing, however, systematically destroyed the right of Environmental

Packaging Technologies, Inc. and Hambleton to benefit from their contractual

relationship to manufacture and distribute the Product. By and through his son-in-law, defendant Joseph Tomlinson, Ewing and Enviro-Media, Inc. have frozen Environmental Packaging Technologies, Inc. and Hambleton out of the base material supply process and further prevented Hambleton from receiving contractual payments from the sale of the Product.

## PARTIES

1.    Plaintiff Environmental Packaging Technologies, Inc. ("EPT") is a corporation duly organized under the laws of Massachusetts, with a principal place of business in Nahant, Massachusetts.

2.    Plaintiff Thomas P. Hambleton is an individual residing in Nahant, Massachusetts.

3.    Defendant William D. Ewing is an individual residing in Providence, Rhode Island.

4.    Defendant Enviro-Media, Inc. ("EM") is a corporation duly organized under the laws of Florida, with a principal place of business in Providence, Rhode Island.

5.    Defendant Joseph Tomlinson is an individual residing in the State of Rhode Island.

6.    Plaintiff Hambleton and Defendant Ewing are the sole shareholders of EPT, with each owning fifty (50%) percent of EPT's outstanding shares. Hambleton and Ewing are EPT's only directors. Hambleton is EPT's president.

7.    Defendant Ewing, on information and belief, is EM's sole shareholder.

## JURISDICTION AND VENUE

8.    This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. §1332 in that this is an action between parties of different states and the amount in

2

controversy is in excess of the jurisdictional minimum of $75,000.00, exclusive of costs and interest. The Court has personal jurisdiction over the Defendants pursuant to the Massachusetts Long-Arm Statute, G.L. c. 223A, as the Defendants transact business in the Commonwealth, the claims against them arise out of the transaction of business in Massachusetts, and they have maintained sufficient minimum contacts with the Commonwealth so as to subject themselves to the jurisdiction of courts located in Massachusetts. This Court has supplemental jurisdiction over the state law claims at issue pursuant to 28 U.S.C. §1367.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that the Defendants are non-residents and the Plaintiffs are located in eastern Massachusetts.

## RELEVANT FACTS

10.      Hambleton has been a product development consultant for over thirty years. From 1970 to 2000, Hambleton worked as a consultant at Arthur D. Little, Inc. ("ADL"). While at ADL, Hambleton met Ewing. Ewing is an inventor, patent holder and entrepreneur. Hambleton and Ewing worked together on several projects, holding a joint patent application on one concept, and developed a close and trusting, working relationship.

11.      In or about 1998, Ewing approached Hambleton for advice on a new project that Ewing was developing. The product concept was novel and could potentially revolutionize the industry for which it was designed ("Product"). Ewing had at the time patents' pending on elements of the Product. He also had manufactured crude Product samples and had run tests on the durability of the Product samples. Ewing's initial concept to exploit the Product was to license its manufacture and sale and he asked

3

Hambleton to assist him in developing a comprehensive licensing strategy and to license the Product to a specific set of companies.

12.    During the course of their business relationship, Ewing informed Hambleton that a separate patent existed that may have prevented Ewing from selling the Product in the United States. Upon Hambleton's advice, and with the assistance of counsel, Ewing agreed to license this patent ("License") for an annual minimum license fee of $50,000.00.

13.    With the License secured, Ewing and EM were in the position to control the manufacture and distribution of the Product. The Product was comprised of a base material that was coated with a proprietary coating.

14.    Some five years ago, at the urging of a close friend of Ewing's, Ewing asked Hambleton to assist him in developing an effective product development and marketing strategy. During an initial luncheon meeting with Ewing and his aforementioned business friend, Hambleton agreed to devote significant time and energy on the Product project in return for 20% of the gross return on revenues generated by the Product. Ewing agreed in principle to a 20% return for Hambleton, but he insisted on exclusive ownership of all related intellectual property. The parties agreed to work together while they documented the details of their business arrangement.

15.    During the subsequent two years, Hambleton, in good faith, advised Ewing and EM while they continued to negotiate the details of their business relationship. They spoke and met frequently during this period, often talking several times a day. Hambleton devoted significant time to their project and provided invaluable assistance to Ewing and EM. Most significantly, Hambleton advised Ewing to modify his original

4

business plan of licensing the Product and instead separate out the manufacturing, coating and distribution processes as separate profit centers.

16.    By mid-2002, Hambleton and Ewing had agreed on a business arrangement that allowed Ewing, through EM, to retain sole ownership over the intellectual property while giving Hambleton the ability to earn approximately 20% of the gross revenues generated from the manufacture, sale and distribution of the Product. The parties agreed to form EPT, a new corporation in which Hambleton and Ewing were equal shareholders, to exclusively supply EM with base material, including coated and uncoated material. EM would retain exclusive control over the distribution of the Product. Pursuant to this arrangement, Ewing and EM would focus on intellectual property protection, with Hambleton's help, as needed. Hambleton and EPT would control the supplier base to ensure a consistent quality product, and to respond to the needs of the licensees and oversee product revisions. EPT would accomplish this by sub-licensing EM's intellectual property in supply agreements to qualified suppliers and coaters of base material. Ewing was to supply the necessary funding to support the business development efforts until sufficient funds were earned to support the salary base.

17.    The business arrangement between Hambleton and Ewing was memorialized in three written agreements executed in the fall of 2002 and certain oral agreements reached at or about the same time period.

18.    On or as of September 30, 2002, after more than two years of negotiation, Ewing and Hambleton entered into a binding, letter agreement entitled, "Agreement to Establish Business Relationship (exclusive supply for Enviro-Media base material)"

5

("Exclusive Base Supply Agreement")  The Exclusive Base Supply Agreement provides,

in pertinent part:

> ***Enviro-Media hereby grants Environmental Packaging Technologies
> the exclusive, non-revocable right to supply Enviro-Media base material
> (base film and coated film) worldwide, and management of the supply of
> base material for Enviro-Media.***  In performing these functions,
> Environmental Packaging Technologies agrees to use reasonable efforts to
> locate, qualify, and manage suitable companies to supply the needs of
> Enviro-Media's converter licensees, as they may exist from time to time.
> The supply agreements established with all such companies shall be
> subject to the approval of Enviro-Media, which approval shall not be
> unreasonably withheld.
>
> ***Enviro-Media agrees to utilize no other individual or entity to perform
> such supply and management functions.  The right to perform these
> supply and management functions for Enviro-Media is being
> specifically granted to Environmental Packaging Technologies, and
> cannot be transferred or assigned.***  In the event that either Enviro-Media
> or Environmental Packaging Technologies are dissolved or otherwise
> ceases to exist, Mr. Hambleton's and Mr. Ewing's rights to exclusively
> supply the base material will continue as individuals and be governed [by]
> the EPT combined consent agreement dated October 11, 2002
> (compensation and income distribution agreement).   Environmental
> Packaging Technologies acknowledges that Enviro-Media shall retain
> exclusive ownership of all patents and other intellectual property, and
> nothing in this agreement shall convey an ownership or other interest in
> such property to Environmental Packaging Technologies or any other
> individual or entity.

19.    The Exclusive Base Supply Agreement was signed by Ewing, as President

of EM, and Hambleton, as President of EPT.

20.    On or as of October 11, 2002, Ewing and Hambleton entered into a

"Combined Consent of Stockholders and Directors" of EPT ("EPT Combined Consent

Agreement").  As set forth in the EPT Combined Consent Agreement, Ewing and

Hambleton, as EPT's directors, agreed that "Mr. Hambleton's base salary [would] be set

at $200,000.00 (two hundred thousand dollars) per annum … [to] be derived from the

first $200,000.00 received by the corporation after deducting the business expenses."

6

The EPT Combined Consent Agreement further provided that EPT income "flowing" from Ewing or EM projects was to be distributed between the shareholders on a "50/50% basis after allocated business expense," and that such income "flowing" from Hambleton projects shall be distributed between Ewing and Hambleton on a "25/75% basis with Mr. Hambleton receiving the 75% after allocated business expense." They also agreed to pay the premiums on an insurance policy for Hambleton as a corporate business expense and commence salary payments to Hambleton and shareholder quarterly distributions on January 1, 2003.

21.    On or about November 6, 2002, EM, by its President, Ewing, entered into a letter agreement with Hambleton, individually, entitled "Revenue sharing agreement for Enviro-Media Technology" ("EM Revenue Sharing Agreement"). The "effective date" of the EM Revenue Sharing Agreement "will be January 1, 2000 when [Hambleton's] dedicated efforts to assist me in licensing the technology began." The purpose of the EM Revenue Sharing Agreement was "to serve as confirmation of our agreement wherein I [Ewing], and or I through Enviro-Media will share 10% of all gross revenue received from the licensing and royalty income generated and/or any other sources of revenue paid to Enviro-Media from exploiting Enviro-Media's technology." The EM Revenue Sharing Agreement states that this 10% revenue sharing agreement is "in addition to the agreement between EM and EPT to establish a 'Technology Alliance' to supply the base materials to licensees." The EM Revenue Sharing Agreement "shall be in effect for the useful life of the existing or any new patents to extend the useful life of the technology that allows revenue to be generated."

7

22.     In addition to the written agreements, Ewing, as co-majority shareholder of EPT, agreed to finance EPT's ongoing out-of-pocket business expenses, including Hambleton's travel costs, until such time as EPT's revenues could cover its business expenses.

23.     Hambleton has devoted thousands of hours of time and effort to develop the base material supply and coating business and to open markets for the Product.  For example, from 2002 until the summer of 2003, Hambleton and EPT, with the participation of Ewing and EM, worked with several American and Canadian manufacturers and specialty coaters to develop a domestic supply chain and related licensing relationships.  In addition, Hambleton and EPT have negotiated with a major Asian base material manufacturer and coater ("Asian Manufacturer") to develop a base material supply and Product market in Asia.

24.     By early-2003, Ewing was experiencing increasing health issues.  To assist EM, Ewing brought in his son-in-law, Joseph Tomlinson.  Tomlinson, on information and belief, holds an MBA and had some experience in promoting athletic events in so-called "extreme sports."  However, he had no business experience in heavy manufacturing or in the process of industrial base material supply or product development.  On information and belief, Tomlinson was not a shareholder, officer, director or employee of EM, and has never been a shareholder, officer, director, employee or agent of EPT.

25.     During the first half of 2003, Tomlinson looked at alternative Product distribution models (such as franchising out the manufacturing and distribution process) and the development of a revised business plan concept for EM.  Both EM and EPT were

8

under-capitalized during this time period, as Ewing paid for various corporate expenses only reluctantly. At Ewing's request, Hambleton worked with Tomlinson with the expectation that this assistance might lead to financing for the business start-up operations.

26.    By the summer of 2003, Tomlinson, with the encouragement, authorization and support of Ewing and EM, interjected himself into the negotiations with the prospective American suppliers of base material and coaters. Even though EPT and Hambleton had the exclusive contractual right to manage the base material supply process, Ewing insisted that Tomlinson negotiate alone with the prospective American base material suppliers and coaters.

27.    In or about September 2003, Tomlinson informed Hambleton that the Exclusive Base Supply Agreement was not enforceable and would not be honored by EM. He further instructed EM's counsel to cease all direct communications with Hambleton. Tomlinson notified Hambleton that he was no longer authorized by EM to contact or negotiate with any domestic potential supplier of base material or coating.

28.    On information and belief, Tomlinson notified the prospective American base material suppliers and coaters that Hambleton was no longer authorized to negotiate on behalf of EM and that EPT was not authorized to negotiate or contract for base material supply or coating. Tomlinson's notification to potential American base material suppliers and coaters was made with actual knowledge of the Exclusive Base Supply Agreement and EM Revenue Sharing Agreement and with the intent to interfere with EPT's exclusive supply and coating relationship with these manufacturers. Tomlinson's efforts to destroy the contractual right of EPT and Hambleton to manage the base

9

material supply and coating process were undertaken with the support, encouragement and approval of Ewing. As a result of Tomlinson's notification to potential American base material suppliers and coaters that they were no longer authorized to negotiate with Hambleton, Hambleton has been frozen out of the domestic base material supply process and EPT has been barred from managing the process.

29.    However, Tomlinson and Ewing, during the fall and winter of 2003-2004, did not interject themselves into the negotiations with the Asian Manufacturer, insisting instead that Hambleton conduct those negotiations. Hambleton had extensive consulting experience in the Asian market. Hambleton had numerous telephone and face-to-face meetings with the U.S. agent for the Asian Manufacturer, which eventually led to the exchange of term sheets in December 2003. The draft term sheets contemplated contracting with EPT for the supply and coating of base material and the licensing of EM's intellectual property for the exclusive right to manufacture and market the Product in the Asia Pacific region. Finalizing the agreement required the approval of EM and the Asian Manufacturer's Asian headquarters. The term sheet required an upfront development fee payment by the Asian Manufacturer to EPT of $200,000.00.

30.    As a part of the process of finalizing an agreement with EPT, the Asian Manufacturer in January 2004 requested from EPT and EM certain technical information to assess the Product's viability before committing funds to manufacturing, coating and marketing. Hambleton, upon receipt of the inquiries, requested responses from Ewing related to sample Products. Ewing did not respond.

31.    On March 8, 2004, while the Asian Manufacturer evaluated the prospects for manufacturing, coating, distribution and marketing of the Product, Ewing notified

10

EPT and Hambleton by email that EM was "terminating" the Exclusive Base Supply Agreement due to Hambleton's alleged failure to close the Asian Manufacturer deal. Hambleton promptly notified Ewing that EM's alleged termination notice has no basis in the parties' contractual agreements and hence was null and void.

32.    Soon after Ewing delivered EM's purported notice of termination, Tomlinson, on information and belief, contacted the Asian Manufacturer's U.S.-based agent and informed him that Hambleton and EPT were no longer authorized to negotiate a supply or distribution agreement on behalf of EM. Tomlinson, with the acquiescence of Ewing, has since interfered with EPT's exclusive contractual right to negotiate the base supply material and coating agreement with the Asian Manufacturer and has systematically undercut Hambleton's ability to close any such deal with the Asian Manufacturer. The U.S.-based agent of the Asian Manufacturer has notified Hambleton that Tomlinson's interference in their negotiations has caused serious, and potentially irreparable damage to the business relationship with the Asian Manufacturer. On information and belief, the Asian Manufacturer will not close a contract to manufacture and market the Product in the Asia Pacific region without the active involvement of Hambleton and clarification as to the status of the relationship between EPT and EM.

33.    Hambleton recently has spoken with several of the potential domestic suppliers of base material or coating, and in each instance has been informed that Tomlinson has instructed potential base material suppliers or coaters that they may not negotiate with EPT or Hambleton.

34.    On information and belief, Tomlinson, with the consent and support of Ewing, has engaged in a systematic campaign to prevent Hambleton from benefiting

11

from his contractual agreements with EM and Ewing. Tomlinson, with the consent and

support of Ewing, has taken actions with the intent to divert corporate opportunities from

EPT so as to undercut Hambleton's contractual right to share in the profits associated

with the base material supply process and sale of Products by EM.

### STATEMENT OF CLAIMS

### COUNT I

### (Declaratory Relief – Ewing and EM)

35.    The Plaintiffs reallege and incorporate by reference herein in their entirety

the allegations contained in the foregoing paragraphs.

36.    An actual and justiciable controversy exists with respect to the rights and

obligations between and among Ewing, EM, EPT and Hambleton under their contractual

agreements and corporate relationships. Specifically, plaintiffs seek a declaration from

the Court:

a)    that the Exclusive Base Supply Agreement is valid and enforceable,
pursuant to which EPT has the exclusive, non-revocable right to supply
Enviro-Media base material (base film and coated film) worldwide and
manage the supply of base material for EM during the life of EM's related
patents and licensed patent rights. EPT, to date, has used reasonable
efforts to locate, qualify and manage suitable companies to supply the
needs of EM's potential converter licensees.

b)    that the EPT Combined Consent Agreement is valid and enforceable.

c)    that the EM Revenue Sharing Agreement is valid and enforceable.

d)    that Ewing owes EPT and Hambleton a fiduciary duty of utmost good
faith and loyalty.

12

e)    that EPT's "exclusive, non-revocable right to supply base material (base film and coated film) worldwide, and management of the supply of base material for Enviro-Media," are corporate opportunities.

f)    that Ewing's efforts to divert these corporate opportunities away from EPT was a breach of his fiduciary duty.

## COUNT II

### (Breach of Contract – Ewing and EM)

37.    The plaintiffs reallege and incorporate by reference herein in their entirety the allegations contained in the foregoing paragraphs.

38.    Ewing and EM, by their conduct, breached their written contracts with EPT and Hambleton, as a result of which EPT and Hambleton have suffered substantial loss and damage.

## COUNT III

### (Breach of the Covenant of Good Faith and Fair Dealing – Ewing and EM)

39.    The plaintiffs reallege and incorporate by reference herein in their entirety the allegations contained in the foregoing paragraphs.

40.    The written contracts between Ewing and EM and EPT and Hambleton contained an implied covenant of good faith and fair dealing. By their conduct, defendants Ewing and EM breached their obligations to deal fairly and in good faith with EPT and Hambleton, as a consequence of which plaintiffs have suffered substantial loss and damage.

13

## COUNT IV

### (Breach of Fiduciary Duty - Ewing)

41.   The plaintiffs reallege and incorporate by reference herein in their entirety the allegations contained in the foregoing paragraphs.

42.   As an equal shareholder, officer and director of EPT, Ewing owed Hambleton and EPT a fiduciary duty of loyalty.  By his conduct, Ewing has breached his fiduciary duty owed to plaintiffs by, *inter alia*, diverting corporate opportunities, undermining the corporation's business, encouraging and allowing Tomlinson to notify potential base material suppliers that EPT and Hambleton were not authorized to negotiate base material supply arrangements for the Product, preventing Hambleton from receiving the fruits of their business partnership and failing to act in good faith to further the interests of EPT.  As a foreseeable consequence, the plaintiffs have suffered and continue to suffer substantial harm and damage proximately caused by Ewing's unlawful conduct.

## COUNT V

### (Conversion – Ewing and EM)

43.   The plaintiffs reallege and incorporate by reference herein in their entirety the allegations contained in the foregoing paragraphs.

44.   By their conduct, Ewing and EM have converted corporate opportunities and revenues from EPT and Hambleton, to which they are not lawfully entitled, to their own benefit and account.  As a consequence, plaintiffs have suffered and continue to suffer substantial harm and damage proximately caused by Ewing's and EM's unlawful conduct.

14

**COUNT VI**

**(Accounting – Ewing and EM)**

45.    The plaintiffs reallege and incorporate by reference herein in their entirety the allegations contained in the foregoing paragraphs.

46.    EPT and Hambleton are entitled to, and seek, an accounting from Ewing and EM as to the base material supply business and Product sales results to date.

**COUNT VII**

**(Tortious Interference with Contractual Relations – Tomlinson)**

47.    The plaintiffs reallege and incorporate by reference herein in their entirety the allegations contained in the foregoing paragraphs.

48.    By his conduct, Tomlinson has tortiously interfered with EPT's and Hambleton's contractual rights under the Exclusive Base Agreement, EPT Combined Consent Agreement and EM Revenue Sharing Agreement. As a consequence, plaintiffs have suffered and continue to suffer substantial harm and damage proximately caused by Tomlinson's unlawful conduct.

**COUNT VIII**

**(Tortious Interference with Advantageous Relations – Tomlinson)**

49.    The plaintiffs reallege and incorporate by reference herein in their entirety the allegations contained in the foregoing paragraphs.

50.    By his conduct, Tomlinson has tortiously interfered with EPT's and Hambleton's advantageous relations to exploit the benefits of their contractual rights with Ewing and EM. As a consequence, plaintiffs have suffered and continue to suffer substantial harm and damage proximately caused by Tomlinson's unlawful conduct.

15

## COUNT IX

### (Conspiracy – All Defendants)

51.    The plaintiffs reallege and incorporate by reference herein in their entirety the allegations contained in the foregoing paragraphs.

52.    By their conduct, Ewing, EM and Tomlinson unlawfully conspired to put EPT out of business and prevent Hambleton from profiting from his shareholder and contractual rights to benefit from the manufacture and sale of the Product. As a consequence, plaintiffs have suffered and continue to suffer substantial harm and damage proximately caused by defendants' unlawful conduct.

## COUNT X

### (Violation of G.L. c. 93A, §11 – All Defendants)

53.    The plaintiffs reallege and incorporate by reference herein in their entirety the allegations contained in the foregoing paragraphs.

54.    The defendants are engaged in commerce. By their conduct, defendants have willfully utilized unfair and deceptive acts and practices in violation of Section 11 of Chapter 93A of the General Laws of Massachusetts, to prevent EPT from engaging in commerce, unlawfully divert corporate opportunities from EPT to themselves and prevent Hambleton from profiting from his advantageous contractual relationships with Ewing and EM. As a consequence, plaintiffs have suffered and continue to suffer substantial harm and damage proximately caused by defendants' unlawful conduct.

### RELIEF REQUESTED

**WHEREFORE,** the plaintiffs respectfully request:

1.    that judgment be entered for plaintiffs on each count of this complaint in an amount of plaintiffs' direct and foreseeable damages;

16

2.    that the Court order the declaratory relief sought in Count I;

3.    on motion of the plaintiffs, that injunctive relief be granted enjoining defendants from further interference with plaintiffs' contractual rights;

4.    that on Count X plaintiffs be awarded their consequential damages, such amount to be doubled or trebled, and awarded their reasonable attorneys' fees and costs; and

5.    an award of such further or alternative relief as the Court may deem appropriate.

### JURY DEMAND

**DEMAND IS HEREBY MADE FOR A TRIAL BY JURY ON ALL ISSUES PROPERLY TRIABLE TO A JURY.**

Respectfully submitted,

**ENVIRONMENTAL PACKAGING TECHNOLOGIES, INC. and THOMAS P. HAMBLETON,**

By their attorneys,

Gary R. Greenberg, BBO #209420
Joseph P. Davis III, BBO # 551111
Jennifer Martin Foster, BBO# 644796
GREENBERG TRAURIG, LLP
One International Place, Twentieth Floor
Boston, Massachusetts 02110
(617) 310-6000

Dated:  July 16, 2004

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Environmental Packaging Technologies
and Thomas P. Hambelton

## DEFENDANTS

William D. Ewing, Enviro-Media, Inc.,
and Joseph Tomilson

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Essex

(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Providence

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Joseph P. Davis, III
Greenberg Traurig, LLP
One International Place - Boston, MA 02110

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION    (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☒ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                                AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## V. NATURE OF SUIT    (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury — Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act |  | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine / **PERSONAL PROPERTY** ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 710 Fair Labor Standards Act / ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability |  | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability |  |  | ☐ 720 Labor/Mgmt. Relations / ☐ 863 DWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** |  | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act / ☐ 865 RSI (405(g)) | | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights / ☐ 540 Mandamus & Other |  |  | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property |  / ☐ 550 Civil Rights |  |  |  |
|  |  / ☐ 555 Prison Condition |  |  |  |

## VI. CAUSE OF ACTION  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

### PLEASE SEE ATTACHED

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY    (See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE    7/15/04

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)___Environmental Packaging   v.  William D.  Ewing

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

☐ I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

☒ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

☐ IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

☐ V. 150, 152, 153.

04 - 11587 WGY

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
YES ☐   NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)
YES ☐   NO ☒
If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
YES ☐   NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
YES ☐   NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
YES ☒   NO ☐

A. If yes, in which division do all of the non-governmental parties reside?
Eastern Division ☒   Central Division ☐   Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
Eastern Division ☐   Central Division ☐   Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
YES ☐   NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME___Joseph P. Davis, III, Esq.
ADDRESS    Greenberg & Traurig, LLP  One International Place, Boston, MA 02110
TELEPHONE NO._617-310-6000

(Coversheetlocal.wpd - 10/17/02)