UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **ENVIRONMENTAL PACKAGING TECHNOLOGIES, INC. AND THOMAS P. HAMBLETON,** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) ) |
| **WILLIAM D. EWING, ENVIRO-MEDIA, INC., AND JOSEPH TOMLINSON,** | ) ) ) |
| **Defendants.** | ) ) ) |

CIVIL ACTION
NO.  04-CV-11587-WGY

## ANSWER AND COUNTERCLAIM

The defendants, Enviro-Media, Inc. ("EM"), William D. Ewing ("Ewing"), and Joseph Tomlinson ("Tomlinson") (collectively, "Defendants"), hereby answer the complaint filed by the plaintiffs Environmental Packaging Technologies, Inc. ("EPT") and Thomas P. Hambleton ("Hambleton") (collectively, "Plaintiffs") as follows:

The introductory paragraph of the complaint contains Plaintiffs' narrative characterization of this case, and as such no response is required. To the extent a response is required, the allegations of the introductory paragraph are denied.

### PARTIES

1.      Admitted that EPT was formed as a Massachusetts corporation in 2002. Defendants are without sufficient knowledge or information to admit or deny the remaining allegations in Paragraph No. 1, and therefore deny same.

2.      Defendants are without sufficient knowledge or information to admit or deny the allegations in Paragraph No. 2, and therefore deny same.

- 1 -

3.      Admitted that William D. Ewing is an individual.  Denied that Ewing lives in Providence, Rhode Island.

4.      Admitted that Enviro-Media was organized under the laws of the state of Florida with a principal place of business in Providence, Rhode Island.  In further response, Enviro-Media is a Florida S-corporation.

5.      Admitted.

6.      In response to be allegations in Paragraph No. 5, Defendants state that the allegations in Paragraph No. 5 were true when EPT was formed.  Defendants are without sufficient knowledge or information to admit or deny the allegations in Paragraph No. 5 as of the present, and therefore deny same.

7.      Admitted.

## JURISDICTION AND VENUE

8.      Paragraph 8 states legal conclusions to which no response is required.

9.      Paragraph 9 states legal conclusions to which no response is required.

## RELEVANT FACTS

10.     Defendants admit that Hambleton worked for Arthur D. Little, and are otherwise without sufficient knowledge or information to admit or deny the allegations in the first two sentences of Paragraph No. 10, and therefore deny same.  Ewing admits that he met Hambleton while Hambleton was working at Arthur D. Little, and that Ewing is a patent holder, inventor, and entrepreneur.  In response to the allegations in the last sentence of Paragraph No. 10, Defendants admit that Hambleton and Ewing worked together on several projects, and deny the remaining allegations.

11.     Defendants admit that in 1998, Ewing and Hambleton had certain discussions

- 2 -

concerning a product that Ewing was developing, and that Ewing had certain product samples and had run certain durability tests. Defendants deny the remaining allegations in Paragraph No. 11.

12.    Defendants admit that a patent existed with a potential impact on the product being considered by Ewing, and that Ewing obtained a license with respect to that Patent and that the License had an annual minimum fee of $50,000. Defendants deny the remaining allegations of Paragraph No. 12.

13.    In response to the allegations of the first sentence of Paragraph No. 13, the License Agreement speaks for itself, and Defendants deny any allegations that are inconsistent with the same. Defendants deny that EM was in a position to control the manufacture and distribution of the product, or that Ewing was in a position to control the manufacture of the product. Defendants admit that the product is a base material, and further state it may or may not be coated. Defendants deny any remaining allegations in Paragraph No. 13.

14.    Defendants admit that Ewing and Hambleton met to discuss various issues associated with the development of the product. In further response, Ewing states that he made clear that at all times he would retain exclusive ownership of any intellectual property or intellectual property rights associated with the product. Defendants deny the remaining allegations of Paragraph No. 14.

15.    In response to the allegations in Paragraph No. 15, Defendants admit that Ewing and Hambleton did some work with respect to a development of the product, that Hambleton sought to negotiate the terms of a business relationship, and that Hambleton proposed certain business strategies. Defendants deny the remaining allegations of Paragraph No. 15.

16.    Defendants admit that Ewing and Hambleton formed EPT; that EPT's corporate

documents speak for themselves, and Defendants deny any allegations that are inconsistent with the same. Defendants deny any remaining allegations of Paragraph No. 16.

17. In response to the allegations in Paragraph No. 17, Ewing and EM admit that there were certain correspondence with Hambleton and/or EPT during 2002 and Ewing and Hambleton signed a document entitled Combined Consent of Stockholders and Directors as stockholders and directors of EPT. These documents speak for themselves and Defendants deny any allegations that are inconsistent with same. Defendants deny that there were any oral agreements and deny any remaining allegations in Paragraph No. 17.

18. Defendants deny that the September 30, 2002 letter referenced in Paragraph No. 18 is a binding agreement. In further response, the Defendants state that the September 30, 2002 letter speaks for itself, and deny any allegations that are inconsistent with same. Defendants deny any remaining allegations in Paragraph No. 18.

19. The September 30, 2002 letter speaks for itself, and Defendants deny any allegations that are inconsistent with same. Defendants deny any remaining allegations in Paragraph No. 19.

20. Defendants admit that Hambleton and Ewing signed a document "Combined Consent of Stockholders and Directors" of dated October 11, 2002. As to the remaining allegations of Paragraph No. 20, the Combined Consent of Stockholders and Directors is a written document that speaks for itself, and Defendants deny any allegations that are inconsistent with same. Defendants deny any remaining allegations in Paragraph No. 20.

21. In response to the allegations in Paragraph No. 21, Defendants state that the November 6, 2002 letter is a written document that speaks for itself, and Defendants deny any allegations that are inconsistent with same. Defendants deny any remaining allegations in

- 4 -

Paragraph No. 21.

    22.    Denied.

    23.    In response to the allegations in Paragraph No. 23, Defendants admit that Hambleton and EPT had some communication with American and Canadian manufacturers and specialty coaters, and engaged in limited negotiations with an Asian base material manufacturer and coater. In further response, Defendants deny Plaintiffs' characterizations of Plaintiffs' work and deny any remaining allegations in Paragraph No. 23.

    24.    In response to the allegations in Paragraph No. 24, Defendants admit that at various points in time, including 2003, Ewing experienced significant health issues. In further response, Defendants admit that Tomlinson is Ewing's son-in-law, that he did not have prior experience in heavy manufacturing or industrial base material supply, and that he was not a shareholder, officer, director, employee or agent of EM or EPT. In further response, Defendants state that Tomlinson was involved with the development of the product prior to Ewing's discussion of same with Hambleton. Defendants deny any remaining allegations of Paragraph No. 24.

    25.    Admitted that Tomlinson reviewed multiple options for business development. Defendants deny the remaining allegations of Paragraph No. 25.

    26.    Admitted that during the summer of 2003, Tomlinson was involved in certain discussions with prospective American base material suppliers and coaters. Defendants deny any remaining allegations of Paragraph No. 26.

    27.    In response to the allegations in Paragraph No. 27, Defendants state that in or about September 2003, Tomlinson told Hambleton of Ewing's view that the September 30, 2002 letter was not an enforceable agreement and that it did not reflect the discussions between Ewing

LITDOCS/567679.4

and Hambleton.  In further response, Defendants state that Tomlinson later advised Hambleton should not represent himself as an agent of Ewing.  Defendants deny any remaining allegations of Paragraph No. 27.

28.    Denied.

29.    Defendants are without sufficient knowledge or information to admit or deny the allegations of the second sentence of Paragraph No. 29, or the allegations with respect to the term sheets, and therefore deny same.  Defendants deny the remaining allegations in Paragraph No. 29.

30.    Defendants are without sufficient knowledge or information to admit or deny the allegations of the first sentence of Paragraph No. 30, and therefore deny same.  Defendants deny the remaining allegations of Paragraph No. 30.

31.    In response to the allegations in Paragraph No. 31, the Defendants state that in 2004 Ewing notified Hambleton that whatever agreement on the relationship which existed related to Ewing's intellectual property rights was terminated, and that Hambleton responded by denying any right by Ewing to terminate any agreement on relationship.  Defendants are without sufficient knowledge or information to admit or deny the allegations with respect to the Asian manufacturer, and therefore deny same.

32.    Defendants admit that Tomlinson advised the Asian manufacturer that Hambleton and EPT no longer represented Ewing's interests with regard to the exploitation of Ewing's intellectual property.  Defendants are without sufficient knowledge or information to admit or deny the allegations of the third and fourth sentences of Paragraph No. 32, and therefore deny same.  Defendants deny the remaining allegations of Paragraph No. 32.

33.    Defendants are without sufficient knowledge or information to admit or deny the

- 6 -

allegations of Paragraph No. 33, and therefore deny same.

34.    Denied.

## STATEMENT OF CLAIMS

### COUNT I

#### (Declaratory Relief—Ewing and EM)

35.    The Defendants incorporate by reference each of the previously numbered paragraphs of their Answer as if fully set forth herein.

36.    Paragraph 36 states legal conclusions to which no response is required.  To the extent a response is required, the Defendants deny the allegations of Paragraph No. 36.

### COUNT II

#### (Breach of Contract—Ewing and EM)

37.    The Defendants incorporate by reference each of the previously numbered paragraphs of their Answer as if fully set forth herein.

38.    Denied.

### COUNT III

#### (Breach of the Covenant of Good Faith and Fair Dealing—Ewing and EM)

39.    The Defendants incorporate by reference each of the previously numbered paragraphs of their Answer as if fully set forth herein.

40.    The first sentence Paragraph No. 40 states a legal conclusion to which no response is  required.  The remaining allegations of Paragraph No. 40 are denied.

### COUNT IV

#### (Breach of Fiduciary Duty—Ewing)

41.    The Defendants incorporate by reference each of the previously numbered

- 7 -

paragraphs of their Answer as if fully set forth herein.

42.     The first sentence of Paragraph No. 42 states a legal conclusion to which no response is required.  The remaining allegations of Paragraph No. 42 are denied.

## COUNT V

### (Conversion—EM and Ewing)

43.     The Defendants incorporate by reference each of the previously numbered paragraphs of their Answer as if fully set forth herein.

44.     Denied.

## COUNT VI

### (Accounting—Ewing and EM)

45.     The Defendants incorporate by reference each of the previously numbered paragraphs of their Answer as if fully set forth herein.

46.     Denied.

## COUNT VII

### (Tortious Interference with Contractual Relations—Tomlinson)

47.     The Defendants incorporate by reference each of the previously numbered paragraphs of their Answer as if fully set forth herein.

48.     Denied.

## COUNT VIII

### (Tortious Interference with Advantageous Relations—Tomlinson)

49.     The Defendants incorporate by reference each of the previously numbered paragraphs of their Answer as if fully set forth herein.

50.     Denied.

LITDOCS/567679.4

## COUNT IX

### (Conspiracy—All Defendants)

51.     The Defendants incorporate by reference each of the previously numbered paragraphs of their Answer as if fully set forth herein.

52.     Denied.

## COUNT X

### (Violation of M.G.L. c. 93A, § 11)

53.     The Defendants incorporate by reference each of the previously numbered paragraphs of their Answer as if fully set forth herein.

54.     Defendants admit that they are engaged in commerce.  Defendants deny the remaining allegations of Paragraph No. 54.

### AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint, and each count thereof, fails to state a claim upon which relief may be granted.

### Second Affirmative Defense

The letter agreements referenced in the Complaint are not enforceable contracts.

### Third Affirmative Defense

Hambleton and/or EPT had no oral contract with EM and/or Ewing.

### Fourth Affirmative Defense

If the letter agreements were enforceable contracts, the Plaintiffs committed material breaches of the alleged letter agreements, thereby prohibiting the Plaintiffs from recovering on any of the asserted claims or otherwise recovering any of the damages claimed herein.

**Fifth Affirmative Defense**

The Plaintiff's claims are barred by the doctrines of unclean hands, waiver, estoppel, payment,

release, fraud, deceit and misrepresentation.

**Sixth Affirmative Defense**

The statute of frauds bars Plaintiffs' claims based on the existence of an oral agreement.

**Seventh Affirmative Defense**

Defendants did not owe fiduciary duties to Hambleton.

**Eighth Affirmative Defense**

The alleged agreements are personal services agreements, and Hambleton is not entitled

to specific performance of these agreements.

**Ninth Affirmative Defense**

Plaintiff's breach of fiduciary duty claims are barred by the equitable doctrine of

acquiescence.

**Tenth Affirmative Defense**

Plaintiffs' breach of contract claims fail because of a lack of valid consideration.

**Eleventh Affirmative Defense**

Plaintiffs' breach of contract claims fail because any work done prior to allegedly

entering into the contracts was past consideration and was not consideration for the contracts

themselves.

**Twelth Affirmative Defense**

Some or all of Plaintiff's claims are barred by the applicable statute of limitation.

**Thirteenth Affirmative Defense**

Plaintiff's claims are barred by the failure of a condition precedent.

LITDOCS/567679.4

### Fourteenth Affirmative Defense

The alleged agreements are unenforceable because of duress and lack of mental capacity.

### Fifteenth Affirmative Defense

Hambleton lacks standing to bring claims that belong to EPT, which must be asserted derivatively.

WHEREFORE, Defendants prays that this Court:

i.   dismiss each of Plaintiffs' claims with prejudice;

ii.  order Plaintiffs to pay to Defendants their reasonable costs and attorneys' fees incurred in defending this suit; and

iii. enter such other and further relief to Defendants that this Court deems just and equitable.

### JURY DEMAND

**DEMAND IS HEREBY MADE FOR A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

LITDOCS/567679.4

## COUNTERCLAIM

Enviro-Media, Inc., William D. Ewing, and Joseph Tomlinson hereby bring this counterclaim (collectively, "plaintiffs-in-counterclaim") against Thomas P. Hambleton and Environmental Packaging Technologies, Inc. (collectively, "defendants-in-counterclaim") for declaratory judgment, accounting, misrepresentation, fraud in the inducement, M.G.L. ch. 93A and, in the alternative, breach of contract.

William D. Ewing ("Ewing") and Enviro-Media, Inc. ("EM") did not have enforceable written contracts with Thomas P. Hambleton ("Hambleton") or Environmental Packaging Technologies, Inc. ("EPT"), and did not have oral contracts with Hambleton or EPT. At most, Ewing and Hambleton discussed a relationship pursuant to which Hambleton would be compensated for successfully negotiating licensing agreements for manufacturing and coating a product developed and patented by Ewing, consisting of a base material to which a coating could be applied (the "Product"). Hambleton was unsuccessful in negotiating successful licensing agreements. Plaintiffs-in-counterclaim are entitled to a declaratory judgment, *inter alia,* that the "agreements" alleged by Hambleton and EPT in their Complaint are invalid and unenforceable.

## PARTIES

1.     Plaintiff-in-counterclaim Enviro-Media, Inc. ("EM") is a dormant S-corporation organized under the laws of the state of Florida, with is principal place of business in Providence, Rhode Island.

2.     Plaintiff-in-counterclaim William D. Ewing ("Ewing") is an individual residing in Tiverton, Rhode Island.

3.     Plaintiff-in-counterclaim Joseph Tomlinson ("Tomlinson") is an individual residing in Rhode Island.

4.      On information and belief, defendant-in-counterclaim Thomas Hambleton ("Hambleton") is an individual residing in Nahant, Massachusetts.

5.      On information and belief, defendant-in-counterclaim Environmental Packaging Technologies, Inc. ("EPT") is a corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business in Nahant, Massachusetts.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this Counterclaim based on diversity pursuant to 28 U.S.C. § 1332, because this dispute is between residents of different states and the amount in controversy exceeds $75,000, exclusive of costs and interests. This Court has personal jurisdiction over the defendants-in-counterclaim because they are residents of the Commonwealth of Massachusetts. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this Court under 28 U.S.C. § 1391. The Defendants reside or have their principal place of business in eastern Massachusetts, and Plaintiffs reside and have their principle place of business in Rhode Island.

## RELEVANT FACTS

8.      Ewing is an inventor and owns patents on elements of the Product that is at issue in this case. Ewing first filed patent applications for the Product in 1996, and has dedicated countless hours to creating, patenting, and commercializing the Product.

9.      Ewing is the President of EM and its sole shareholder. Tomlinson has assisted Ewing with the development and exploitation of the Product for many years, beginning prior to Hambleton's involvement.

10.      Prior to any discussions with Hambleton, and beginning in 1996, Ewing identified

and engaged in discussions with two potential manufacturers regarding licensing the right to manufacture the Product.

11.     Ewing was aware of the existence of another patent that might have an impact on the development of the Product.  Ewing consulted with Tomlinson and with counsel with respect to this patent, and on the advice of and with the assistance of counsel, reached an agreement to license this patent.

12.     In approximately 1999, Ewing met Hambleton and discussed with him the possibility of Hambleton working with Ewing to develop licensing agreements for the Product. Hambleton represented that he had been involved in many licensing activities and had the expertise and industry contacts to be able to successfully develop licensing relationships and agreements with the necessary business partners.  Ewing agreed to continue exploring a possible relationship with Hambleton.  Ewing and Hambleton did not reach any agreement as to a business relationship or to the details of any compensation to be paid to Hambleton for any work he may do with respect to the Product.

13.     At all relevant times, Ewing and Hambleton understood that unless and until a viable business model was developed and licenses on other necessary agreements were negotiated and executed with manufacturers, coaters, distributors or other necessary business partners, there would be no viable business opportunity arriving out of the development of the Product.

14.     In 2002, Ewing and Hambleton met with prospective licensees in an attempt to try to structure the potential licenses for the Product.  Ewing had previously identified these licensees and engaged in various levels of business development discussions with them.

15.     During this time, Hambleton repeatedly presented Ewing with proposals to

- 14 -

govern their potential business relationship that were unacceptable and thus rejected by Ewing. At all relevant times, Ewing made clear that he was not willing to share any "equity" in the intellectual property rights, and that Hambleton would need to successfully generate and manage licensing deal(s) and other business relationships, agreeable to Ewing, in order to earn and receive any compensation from the development of the Product.

16.    During this period, the majority of Hambleton's efforts were designed to establish a series of proposed business relationships and a new business strategy and revenue structure that provided Hambleton an opportunity to earn a profit from the exploitation of Ewing's intellectual property-related business activities.  Knowing that any "royalty" fees paid by Licensees would belong solely to Ewing, the strategy and structure recommended by Hambleton masked royalty revenues by renaming and identifying them as production and material "tolls" which would be paid by Licensees in addition to any royalty.  The result was a business model whereby a new entity would be created and operated by Hambleton in order to craft, negotiate, and secure licensing deal(s) with manufacturers, coaters, and distributors, which ultimately proved to be non-functional.

17.    During the year 2002, Ewing suffered from a number of progressively debilitating health issues, which impacted and interfered with his ability to concentrate and focus.  At all relevant times, Hambleton was aware of Ewing's significant health issues and the impact of those health issues on Ewing.

18.    In May 2002, EM was incorporated in the state of Florida.

19.    During late 2001 and 2003, Hambleton applied great pressure to Ewing to agree to a business relationship between Hambleton and Ewing.  Hambleton repeatedly misrepresented that deals with the potential licensees were imminent and that a formalized Hambleton/Ewing

business relationship was a pre-condition to the execution of those deals. Based on Hambleton's representations, Hambleton and Ewing took certain steps to form EPT in September 2002. Ewing did so to provide Hambleton with the ability to close the proposed licensing deals that Hambleton represented were to be executed imminently.

20.    Once EPT was established, and again asserting the imminent execution of licensing deals, Hambleton pressured Ewing to commit to further agreements designed to provide further compensation to Hambleton.

21.    As part of his efforts to increase his revenue opportunity, Hambleton presented Ewing with several letters containing a variety of terms. Hambleton did so while Ewing's health and ability to focus and make decisions continued to noticeably deteriorate. Hambleton made repeated and intentionally false representations that the absence of an agreement between Hambleton and Ewing was preventing Hambleton in his efforts to execute agreements with potential licensees.

22.    Beginning 2000 and escalating progressively into early 2002, Ewing suffered from depression and increasingly painful and debilitating back pain (and was ultimately diagnosed with a broken back), resulting in reconstructive back and spinal surgery in March 2003. These health issues interfered with Ewing's ability to concentrate and focus, to the point where they rendered Ewing unable to understand in a reasonable manner the nature and consequences of the documents Hambleton was asking him to execute, and unable to act in a reasonable manner in relation to the documents Hambleton was asking him to execute. Hambleton was aware of Ewing's health problems, as Hambleton and Ewing met and worked together during this time. Ewing was not advised by an attorney with respect to the documents Hambleton was asking him to sign.

- 16 -

23.     With knowledge of Ewing's health issues, Hambleton confronted Ewing in a parking lot minutes before a meeting with a potential licensee whom Hambleton represented would be committing to a licensing deal during the meeting.  Hambleton also represented that the immediate execution of a letter agreement to memorialize a business relationship prior to the meeting with the potential licensee was essential.

24.     Hambleton also represented to Ewing that the letters he requested Ewing to sign were in accordance with Ewing's understanding as to the nature of the business relationship.  In reliance on Hambleton's representations as to: 1) the status of current business activities which demanded execution of the letter; 2) the nature of the business relationship outlined within the letter; and 3) the impending execution of such other agreements with the party they were about to meet with, Ewing signed the letters.

25.     The November 6, 2002 letter executed by Ewing did not reflect the terms to which Ewing previously discussed with Hambleton.  All of the prior drafts of the proposed letter agreement made clear that any revenue to be earned by Hambleton was to be based on Hambleton-generated licensing revenues.

26.     Hambleton and Ewing had also discussed changing the agreement to base compensation on gross revenue rather than net revenue, and when Hambleton gave Ewing a copy of the letter to sign, Hambleton represented that the only change in the form of the letter agreement was from net revenue to gross revenue.  Ewing signed the letter, believing that it stated that any revenue to be provided to Hambleton would be based on Hambleton-generated licensing revenues, and that the only change from the prior draft of the letter was from "net revenue" to "gross revenue."

27.     Although the letter was signed on November 6, 2002, at Hambleton's insistence,

LITDOCS/567679.4

Ewing agreed to pre-date the letter to May 15, 2002.

28.    The alleged letter agreement(s) are not an enforceable agreement because, <u>inter alia</u>, they lack material terms, they were procured by misrepresentations, they lack consideration, and, because of his physical and mental health issues and given the circumstances of the execution, Ewing did not have sufficient capacity to enter into enforceable agreements at the time.  Any work done by Hambleton prior to the signing of the letters was past consideration and could not be consideration for the letter agreements themselves.

29.    If the letters are enforceable agreements, Hambleton failed to perform his obligations under the agreements.  Hambleton failed to negotiate effectively with the manufacturers and specialty coaters and failed to negotiate a deal with these entities.  Hambleton did not respond to the manufacturers' and specialty coaters' concerns, and was not engaged in their development of the process for manufacturing the base material and applying the coating. Hambleton also failed to invest sufficient time and monetary resources in order to make the development of the Product a viable business venture and to successfully negotiate and execute the necessary business agreements.

30.    Prior to Hambleton's discussions with Ewing, Tomlinson had advised Ewing with respect to developing the Product.  As Ewing's health declined and because Hambleton's negotiations with the potential licensees were unsuccessful, at Ewing's request Tomlinson contacted Hambleton to offer his assistance.

31.    Hambleton told Tomlinson that the deals were not going well as hoped, that Hambleton had no money to put toward the development of the Product, that Hambleton was unable to dedicate any substantive time to the development of the Product due to the absence of capital and the fact that EPT was not in a position to generate any revenue, and that he would

- 18 -

welcome Tomlinson's involvement and efforts.

32.    To try to move the business forward, Tomlinson reviewed multiple options for business development.  Tomlinson also became involved in the negotiations with the prospective suppliers of base materials and coaters.  Tomlinson assisted in dealing with what had become a combative relationship between Hambleton and the two prospective licensees, and reinforcing Ewing's rights to the intellectual property, which some prospective licensees were now challenging.

33.    Tomlinson also identified the inherent flaws and failings in the "Technology Alliance" model developed by Hambleton and, with Hambleton's agreement, offered to seek to develop a business model that would allow for the development and exploitation of the Product.

34.    With Hambleton's knowledge and consent, Tomlinson continued to develop and consider various business models in order to leverage Ewing's intellectual property.

35.    During this time, Tomlinson identified and contacted a new potential licensee for the conversion and distribution of the Product.  During a meeting with a potential licensee and without advising Tomlinson of his intention to do so, Hambleton instructed the potential licensee that it would be required to agree to pay Hambleton and EPT an upfront fee of $150,000 even before such potential licensee would be able to review Ewing's intellectual property.  The potential licensee refused to do so, and the opportunity was lost as a result of Hambleton's conduct.

36.    Keeping Hambleton informed of his efforts, Tomlinson continued to try to develop a viable business model.

37.    Ewing identified two potential Asian manufacturers to whom to license the manufacture of the Product, and at Ewing's request Hambleton contacted them regarding the

- 19 -

Product and a potential license. One Asian manufacturer expressed interest in a license. Hambleton failed to promptly respond to this expressed interest. Although Ewing and EM had been disappointed by Hambleton's failed efforts in the past, Ewing encouraged Hambleton to continue discussions with the Asian manufacturer, in order to allow Hambelton to demonstrate that he could successfully negotiate a license for the Product. From September 2003 through February 2004, Ewing repeatedly requested that Hambleton update him on his progress with the Asian manufacturer. Hambleton did not respond to Ewing's requests.

38.    Hambleton refused to provide Ewing with term sheets for his approval before sending any term sheets to the Asian Manufacturer.

39.    Although Hambleton was supposed to be negotiating a deal with an Asian manufacturer, Hambleton did not respond to repeated requests for updates on the negotiations with the Asian manufacturer. Hambleton provided no evidence that he was making any progress whatsoever in these and other negotiations.

40.    In March 2004, given Hambleton's lack of progress in his licensing negotiations, and given the need for Ewing to commercialize the intellectual property as soon as possible, Ewing informed Hambleton that Hambleton was not authorized to act on behalf of Ewing and should not pursue any further discussions.

41.    During the time in which Hambleton was supposed to be working on negotiating and achieving licenses with respect to the Product, upon information and belief, Hambleton engaged in independent consulting work for Maui Land and Pineapple, Inc., Rockline Industries, Graham Packaging Corp, Arthur D. Little, Inc., in addition to other entities, at the expense of progress on exploiting Ewing's intellectual property.

- 20 -

## CLAIMS

## COUNT I

### (Declaratory Judgment)

42.    Plaintiffs-in-counterclaim re-allege and incorporate by reference the allegations in each of the previously numbered paragraphs as if fully set forth herein.

43.    An actual and justiciable controversy exists with respect to the rights and obligations of Hambleton, EPT, Ewing, and EM with respect to the development of the Product. Plaintiffs-in-counterclaim request that the Court: (1) declare there does not exist any enforceable written or oral contract between Ewing, Hambleton or EPT with respect to the Product; (2) if an enforceable relationship does exist, declare the terms of such relationship, including but not limited to, Hambleton's obligations and the conditions to be satisfied in order for Hambleton to be entitled to receive any compensation from the Product; and (3) declare that Hambleton failed to fulfill his obligations.

## COUNT II

### (Fraud/Intentional Misrepresentation)

44.    Plaintiffs-in-counterclaim re-allege and incorporate by reference the allegations in each of the previously numbered paragraphs as if fully set forth herein.

45.    Hambleton made false statements to Ewing and EM concerning the terms of the letters Hambleton asked Ewing and EM to sign, and the need for Ewing and EM to execute these letters.  These terms and whether or not the letters needed to be executed were important to Ewing's and EM's decisions with respect to the letters.  Hambleton knew that his statements with respect to the letters' terms and the need to execute the letters were false, or recklessly made these statements by willfully disregarding their truth or falsity.  Hambleton made these

- 21 -

statements with the intention that Ewing and EM would rely on these statements in making their decision with respect to the letters, and Ewing and EM did in fact reasonably rely on Hambleton's statements.  Ewing and EM have suffered injury and damages as a result.

## COUNT III

### (Negligent Misrepresentation)

46.    Plaintiffs-in-counterclaim re-allege and incorporate by reference the allegations in each of the previously numbered paragraphs as if fully set forth herein.

47.    Hambleton made false statements to Ewing and EM concerning the terms of the letters Hambleton asked Ewing and EM to sign, and the need for Ewing and EM to execute these letters.  These terms and whether or not the letters needed to be executed were important to Ewing's and EM's decisions with respect to the letters.  Hambleton negligently failed to determine whether his statements with respect to the letters terms were false, by making these statements with respect to the terms of the letters without using the amount of care a reasonable person would use to see that what he was true.  Hambleton made these statements with the intention that Ewing and EM would rely on these statements in making their decision with respect to the letters, and Ewing and EM did in fact reasonably rely on Hambleton's statements. Ewing and EM have suffered injury and damages as a result.

## COUNT IV

### (Fraudulent Inducement)

48.    Plaintiffs-in-counterclaim re-allege and incorporate by reference the allegations in each of the previously numbered paragraphs as if fully set forth herein.

49.    Hambleton fraudulently induced Ewing and EM to sign the letters put forth by Hambleton.  Hambleton made false statements to Ewing and EM concerning the terms of the

letters Hambleton asked Ewing and EM to sign, and the need for Ewing and EM to execute these letters.  Hambleton knew that his statements with respect to the letters' terms and the need to execute the letters were false.  Hambleton made these statements with the intention that Ewing and EM would rely on these statements in making their decision with respect to the letters, and Ewing and EM did in fact reasonably rely on Hambleton's statements.  Ewing and EM have suffered injury and damages as a result.

## COUNT V

### (M.G.L. ch. 93A, § 11)

50.    Plaintiffs-in-counterclaim re-allege and incorporate by reference the allegations in each of the previously numbered paragraphs as if fully set forth herein.

51.    Hambleton is engaged in trade or commerce in the Commonwealth of Massachusetts.  By his actions as set forth herein, Hambleton has willfully committed unfair and deceptive trade practices in violation of M.G.L. c. 93A, § 11, by, *inter alia*, misrepresenting to Ewing and EM the need to execute letters to memorialize their business relationship and misrepresenting the terms of those letters.  Ewing and EM have suffered injury and damages as a result.

## COUNT VI

### (Accounting)

52.    Plaintiffs-in-counterclaim re-allege and incorporate by reference the allegations in each of the previously numbered paragraphs as if fully set forth herein.

53.    EM and Ewing are entitled to an accounting from Hambleton for the independent consulting work he has done to date since the formation of EPT at the expense of progress on exploiting Ewing's intellectual property.

## COUNT VII

### (Breach of contract)

54.     Plaintiffs-in-counterclaim re-allege and incorporate by reference the allegations in each of the previously numbered paragraphs as if fully set forth herein.

55.     If it is determined that there are enforceable agreements between Ewing, EM, Hambleton, and/or EPT, Hambleton and EPT, through their conduct as set forth above, breached the agreements, causing injury and damages to Ewing and EM.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs-in-counterclaim respectfully request that this Court:

i.      order the declaratory relief sought in Count I;

ii.     enter judgment in favor of the plaintiffs-in-counterclaim on each count of this counterclaim;

iii.    on Count V, award to plaintiffs-in-counterclaim their consequential damages, such amount to be doubled or trebled, and award to plaintiffs-in-counterclaim their costs and attorneys' fees;

iv.     order an accounting from Hambleton to plaintiffs-in-counterclaim as requested in Count VI; and

v.      award such other and further relief as this Court deems just and proper.

## JURY DEMAND

**DEMAND IS HEREBY MADE FOR A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

LITDOCS/567679.4

Respectfully Submitted,

**ENVIRO-MEDIA, INC., WILLIAM D.
EWING, AND JOSEPH TOMLINSON,**

By their attorneys,


/s/ Melissa G. Liazos _____
John R. Skelton, BBO # 552606
Melissa G. Liazos, BBO #650564
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
telephone: 617-951-8000
email: melissa.liazos@bingham.com


Dated: September 17, 2004

LITDOCS/567679.4

## CERTIFICATE OF SERVICE

I, Melissa G. Liazos, hereby certify that on this 17th day of September, 2004, I served the

attached ANSWER AND COUNTERCLAIM, by mailing copies thereof, postage prepaid to:

Gary R. Greenberg, Esq.
Greenberg Traurig LLP
One International Place, 20th Floor
Boston, MA 02110

/s/ Melissa G. Liazos_____
Melissa G. Liazos

- 26 -